UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DOUGLAS AND TAMMY HERZOG,
husband and wife,

                              Plaintiff,

        v.

PROPERTY AND CASUALTY
INSURANCE COMPANY OF HARTFORD,
a foreign insurer,

                              Defendant.

Case No. 3:16-cv-05083-KLS

ORDER GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT

        This matter is before the Court on plaintiffs' and defendant's separate motions for partial

summary judgment. Dkt. 24, 27. The parties have consented to have this matter heard by the

undersigned Magistrate Judge. 28 U.S.C. § 636(c), Federal Rule of Civil Procedure (FRCP) 73;

Local Rule MJR 13. For the reasons set forth below, the Court finds defendant's motion should be

granted and plaintiffs' motion should be denied.[1]

                        FACTUAL AND PROCEDURAL HISTORY

        Plaintiff Douglas Herzog owns two acres of waterfront property located in Shelton,

Washington, which he purchased in 2006. Dkt. 25, p. 1. At the time of purchase, there was no

house located on the property, but the property did have a large dock consisting of a pier that

extended from the shore out into the water, and a ramp that extended from the end of the pier

down to a floating dock. *Id.* at pp. 1-2. The dock had been located on the property since at least

_____

[1] The parties have requested oral argument in this matter, however the Court finds such argument to be unnecessary.

ORDER - 1

the late 1960s. Dkt. 29-2, p. 5.

In early 2009, Mr. Herzog completed construction of a house and a swimming pool on the property, and began looking to purchase homeowner's insurance. Dkt. 25, p. 2. He reviewed a 'Special Dwelling Insurance' brochure offered by the AARP Homeowners Insurance Program from the Hartford Insurance Group, which includes the Property and Casualty Insurance Company of Hartford (Hartford). *Id.* at pp. 2, 14-15, 21. That brochure described three types of coverage to choose from:

> *All-Risk Replacement Cost Coverage* insures your one- to four-family dwelling against risk of physical damage or loss. . . .
> In the event of a covered loss, The Hartford will pay the full cost of repairing or replacing the dwelling damaged or destroyed–up to the limits of insurance you have selected. . . .
>
> *Actual Cash Value Coverage* insures your one- to four-family dwelling against basic perils. . . .
> In the event of a covered loss, The Hartford will pay the actual cash value of the property damaged, up to the limits of insurance you have selected. (Actual cash value is the estimated replacement cost, less an amount for depreciation of your property due to its age and condition.) . . .
>
> Additional optional coverages[2] may be added to either Actual Cash Value Coverage or All-Risk Replacement Cost Coverage, to ensure that you are appropriately covered against potential financial losses.

*Id.* at p. 15.

Mr. Herzog states he called the telephone number provided in the brochure to request a quotation. *Id.* at p. 3. Mr. Herzog states he spoke to a Hartford agent, telling that agent that he 'wanted to make sure [h]e was fully insured for the full cost of replacing all [his] property in the event of injury, damage, or loss.' *Id.* Mr. Herzog states the agent told him 'that the Hartford offered a 'Sentinel Silver' policy that covered 100 percent of the cost of rebuilding any damage that occurred to my property,' and that the agent 'would provide [him] with a written quotation for

---

[2] Among the additional coverages offered were personal property and landlord's optional coverage. *Id.* at p. 15.

ORDER - 2

such a policy." *Id.*

Shortly after that telephone call, Mr. Herzog received a written quotation from Hartford. *Id.* at p. 17. That quotation lists Mr. Herzog's property address under the heading "Location of dwelling." *Id.* The quotation also sets forth $747,000 for "HOME BUILDING COST." *Id.* Under the headings "REQUIRED COVERAGE" and "LIMITS", the quotation sets forth $747,000 for "DWELLING" and $74,700 for "OTHER STRUCTURES." *Id.* The quotation also states under the heading "LIMITS": "REQUESTED 100% OF REBUILDING COST." *Id.* In addition, under the heading "OPTIONAL COVERAGES AND SPECIAL DISCOUNTS" is listed "SENTINEL SILVER" and "$INCL." *Id.*

In a letter dated March 1, 2009, Hartford informed Mr. Herzog it had issued his policy, and included a two-page document titled "Confirmation of Homeowners Policy Information." *Id.* at pp. 27, 29. On the confirmation of policy information's first page is a section titled "Policy Limits*[3] You Requested," under which is listed:

> COVERAGE A          Dwelling–        $776,000
> COVERAGE B          Other Structures–     $77,600
> . . .
> Requested Coverage A is 100 Percent of Replacement Cost

*Id.* at p. 29. On the second page of the policy information under the section titled "Additional Coverage You Requested" is listed "SENTINEL SILVER." *Id.* at p. 30. Mr. Herzog signed the document and mailed it back to Hartford. *Id.* at pp. 4, 30.

In early April 2009, Hartford notified Mr. Herzog that it was cancelling his policy due to certain issues involving the property's swimming pool. *Id.* at pp. 4-5. Following notification by Mr. Herzog of various measures he took in regard to the swimming pool, Hartford issued another

---

[3] Under "*" the policy information states: "Note: For Homeowners Policies Coverage B, C and D Are Determined as a Percentage of Coverage A." *Id.* at p. 29.

ORDER - 3

declaration page regarding his homeowner's insurance policy. *Id.* at p. 5. It sets forth limit of liability coverage in the amount of $776,000 for "DWELLING" and $77,600 for "OTHER STRUCTURES." *Id.* at p. 38.

Mr. Herzog states he then called Hartford and spoke to an agent, informing that agent of two concerns he had, one of which was: "I wanted to make sure that the policy fully covered the cost of replacing my dock in the event that there were injury or damage to the dock, and I was concerned the limit for 'other structures' in the policy was not high enough to ensure this." *Id.* at pp. 5-6. Plaintiff states the "agent [he] spoke to assured [him], again, that the policy covered the full cost of repairing or replacing any damage to the dock," and "further recommended that [he] purchase, for an additional premium, a special, separate endorsement increasing the coverage limit for the dock only." *Id.* at p. 6. Plaintiff also states:

> I told Hartford's agent that I believed it might cost up to $250,000 to fully replace the dock. In response, the Hartford agent told me that I should purchase a special endorsement adding an additional $99,999 in coverage. The Hartford agent explained that this additional coverage would provide coverage for the full cost of replacing any damage to the dock in addition to the coverage already provided for in the policy. Although I told Hartford's agent that I wanted to insure the dock up to its full replacement value, the Hartford agent advised me that this additional $99,000 was the most additional coverage Hartford could offer by way of endorsement. I agreed that Hartford should issue the endorsement based on the representation that this was the maximum amount of coverage for the cost of replacing the dock Hartford could offer.

*Id.*

The new declaration page Mr. Herzog received from Hartford again sets forth limit of liability coverage in the amount of $776,000 for "DWELLING" and $77,000 for "OTHER STRUCTURES." *Id.* at p. 42. On the second page of that declaration, the following is listed:

OTHER STRUCTURES-RESIDENCE PREMISES
DESCRIPTION: DOCK                    LIMIT   $99,999

ORDER - 4

*Id.* at p. 43. Mr. Herzog paid the additional premium Hartford had requested for this additional $99,000 in liability coverage, and thereafter continued to timely pay all premiums required by Hartford. *Id.* at p. 7.

The insurance policy Mr. Herzog entered into with Hartford includes the following types of coverage:

**A. Coverage A – Dwelling**
    1. We cover:
        a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and
        b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".
    . . .

**B. Coverage B – Other Structures**
    1. We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

Dkt. 29-3, p. 48. In terms of how losses are settled under the above coverages, the policy further provides:

**C   Loss Settlement**
    . . . Covered property losses are settled as follows:

    1. Property of the following types:
        . . .
        c.   Structures that are not buildings . . .
        . . .
    at "actual cash value" at the time of loss but not more than the amount required to repair or replace.

    2. Buildings covered under Coverage A or B at "replacement cost" without deduction for depreciation . . .

*Id.* at pp. 61-62. "Actual cash value" (ACV) is defined as:

    a. When the damage to property is economically repairable, "actual cash value" means the cost of repairing the damage, less reasonable deduction for wear and tear, deterioration and obsolescence;

ORDER - 5

     b.   When the loss or damage to property creates a total loss, "actual cash value" means the market value of property in a used condition equal to that of the destroyed property, if reasonably available on the used market.

     c.   Otherwise, "actual cash value" means the market value of new, identical or nearly identical property less reasonable deduction for wear and tear, deterioration and obsolescence.

*Id.* at p. 45. "Replacement cost" is defined as:

     a.   In case of loss or damage to buildings, "replacement cost" means the cost, at the time of loss, to repair or replace the damaged property with new materials of like kind and quality, without deduction for depreciation.

*Id.* at p. 47. Under the policy, the limit of liability for Coverage A (Dwelling) is $891,000 and for Coverage B (Other Structures) it is $89,100. *Id.* at p. 5. The following additional coverage is also provided:

> OTHER STRUCTURES–RESIDENCE PREMISES
> DESCRIPTION: DOCK                 LIMIT $99,999

*Id.* at p. 6.

In early April 2015, a windstorm damaged plaintiffs' dock, destroying its float, and Mr. Herzog submitted a claim to Hartford for the damage. Dkt. 25, pp. 7, 117. Hartford determined that the replacement cost value (RCV) of the dock was $57,015. Dkt. 28, p. 2. Based on the age of the dock, its lifespan, its condition at the time of loss, as well as other factors, however, Hartford applied a 50 percent depreciation ($26,878.50) to the RCV, to arrive at an ACV of $30,136.50 for the dock. Dkt. 25, pp. 8-9, 118; Dkt. 29-4, pp. 3-5. In August 2015, Hartford sent Mr. Herzog two checks in that amount to settle his claim. Dkt. 25, p. 9.

In January 2016, plaintiffs filed suit in Mason County Superior Court, asserting breach of insurance contract for refusing to pay them more than the ACV for damage to their dock, as well as breach of the Washington State Insurance Fair Conduct Act (IFCA). Dkt. 1-1. Hartford then removed the matter to this Court. Dkt. 1. In their motion for partial summary judgment, Hartford

argues that because plaintiffs' dock is not a "building" as that term is used in the policy, they are only entitled to coverage at ACV. In their motion for partial summary judgment, plaintiffs argue their dock is a "building" for purposes of the policy, and therefore they should have received 100 percent replacement cost coverage.

Plaintiffs further argue that if the Court finds that the policy provides coverage only for ACV, it also will need to determine whether Hartford correctly determined ACV. They argue as well that Hartford acted unreasonably in handling plaintiffs' insurance claim and/or violated the IFCA. For the reasons set forth below, the Court finds plaintiffs' dock is not a "building" as that term is used in the policy, and thus coverage for only ACV applies. Further, because plaintiffs have not presented any specific argument or evidence that Hartford improperly calculated ACV under the policy, they have not shown the amount Hartford deducted was unreasonable. Finally, in light of *Perez-Crisantos v. State Farm Fire & Casualty Co.*, which is currently pending before the Washington State Supreme Court, the Court finds it should refrain from determining whether Hartford's actions violated the IFCA at this time.

## DISCUSSION

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FRCP 56(c). In deciding whether summary judgment should be granted, the Court "must view the evidence in the light most favorable to the nonmoving party," and draw all inferences "in the light most favorable" to that party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). When a summary judgment motion is supported as provided in FRCP 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his or her response, by affidavits or as otherwise provided in FRCP

ORDER - 7

56, must set forth specific facts showing there is a genuine issue for trial. FRCP 56(e)(2).

If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. *Id.* The moving party must demonstrate the absence of a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987). A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." *T.W. Electrical Serv.*, 809 F.2d at 630.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." *Id.* Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" *Id.* (quoting *Anderson*, 477 U.S. at 290). "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *California Architectural Building Prods., Inc.*, 818 F.2d at 1468. In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

I.    The Term "Building"

Under Washington law, "[i]nsurance policies are to be construed as contracts, and interpretation is a matter of law."[4] *State Farm General Ins. Co. v. Emerson*, 102 Wn.2d 477, 480

---

[4] "Where a federal court sits in diversity jurisdiction, it must apply the state substantive law." *Manufactured Housing Communities of Wash. v. St. Paul Mercury Ins. Co.*, 660 F.Supp.2d 1208, 1214 (W.D. Wash. 2009) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64  (1938)).  As there is no indication that the substantive law of Washington does not apply here, that law governs in this case.

ORDER - 8

(1984). "The policy is construed as a whole," and "should be given a fair, reasonable, and sensible

construction as would be given to the contract by the average person purchasing insurance."

*Kitsap Cnty. v. Allstate Ins. Co.*, 136 Wn.2d 567, 575 (1998) (citations and internal quotation

marks omitted); *Washington Pub. Util. Districts' Utils. Sys. v. Pub. Util. Dist. No. 1 of Clallam*

*Cnty.* (*Wash. Pub.*), 112 Wn.2d 1, 10 (1989) ("The entire contract must be construed together in

order to give force and effect to each clause."). "If policy language is clear and unambiguous, a

court may not modify the insurance contract" or "create an ambiguity where none exists." *Kitsap*

*Cnty.*, 136 Wn.2d at 576; *Transcon. Ins. Co. v. Wash. Pub. Utils. Dists.' Util. Sys.*, 111 Wn.2d

452, 456 (1988).

"An ambiguity in an insurance policy is present if the language used is fairly susceptible to

two different reasonable interpretations." *Kitsap Cnty.*, 136 Wn.2d at 576. The language must "*on*

*its face*" be fairly susceptible to both interpretations. *Kish v. Ins. Co. of N. Am.*, 125 Wn.2d 164,

171 (1994) (emphasis in the original). Where there is an ambiguity, "the court must attempt to

discern and enforce the contract as the parties intended." *Transcon. Ins. Co.*, 111 Wn.2d at 456-

57. "If there is an ambiguity, extrinsic evidence, if any, of the parties' intent may normally be

considered." *Kitsap Cnty.*, 136 Wn.2d at 576; *see also Am. Star Ins. Co. v. Grice*, 121 Wn.2d 869,

874 (1993).

Extrinsic evidence, however, "cannot be considered for the purpose of varying the terms

of a written contract." *U.S. Life Credit Life Ins. Co. v. Williams*, 129 Wn.2d 565, 569-70 (1996).

As the Washington Supreme Court has explained:

> [W]e are mindful of the general rule that parol evidence is not admissible for
> the purpose of adding to, modifying, or contradicting the terms of a written
> contract. . . . Such evidence, however, is admitted, not for the purpose of
> importing into a writing an intention not expressed therein, but with the view
> of elucidating the meaning of the words employed. Evidence of this character
> is admitted for the purpose of aiding in the interpretation of what is in the

ORDER - 9

instrument, and not for the purpose of showing intention independent of the instrument.

*Id.* at 570 (1996) (quoting *Berg v. Hudesman*, 115 Wn.2d 657, 669 (1990)). Further, "[u]nilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Id.* (quoting *Lynott v. Nat'l Union Fire Ins. Co.*, 123 Wash.2d 678, 684 (1994). "If a policy remains ambiguous even after resort to extrinsic evidence, then the ambiguity is construed against the insurer." *Kitsap Cnty.*, 136 Wn.2d at 576.

An insurance contract "will be given a practical and reasonable interpretation that fulfills the object and purpose of the contract rather than a strained or forced construction that leads to an absurd conclusion, or that renders the contract nonsensical or ineffective." *Wash. Pub.*, 112 Wn.2 at 11; *see also Transcon. Ins. Co.*, 111 Wn.2d at 457. If the policy defines a term, then the term "should be interpreted in accordance with that policy definition." *Kitsap Cnty.*, 136 Wn.2d at 576. An undefined term, on the other hand, "must be given [its] 'plain, ordinary, and popular' meaning." *Id.* (quoting *Boeing Co. v. Aetna Cas. & Sur. Co.,* 113 Wash.2d 869, 876 (1990)). In addition, "[t]o determine the ordinary meaning of undefined terms, courts may look to standard English dictionaries." *Id.*

Here, the parties disagree on whether plaintiffs' dock is a "building" as that term is used in the insurance policy. As noted above, under the policy if the dock is a "building" then it is covered at replacement cost, without deduction for depreciation. If, on the other hand, the dock is a structure other than a building, it is covered only at ACV less reasonable deduction for wear and tear, deterioration and obsolescence. The term "building" is not defined in the policy. The Court thus must determine what that term means. In doing so, the Court must give it its "plain, ordinary, and popular" meaning." *Id.*

Noting that Washington courts have turned to *Webster's Third New International*

ORDER - 10

*Dictionary* (*Webster*) when needing to define insurance policy terms,[5] defendant urges the Court

to adopt the following definition:

> Building . . . 1 : a thing built: a : a constructed edifice designed to stand more or less permanently, covering a space of land, usu. covered by a roof and more or less completely enclosed by walls, and serving as a dwelling, storehouse, factory, shelter for animals, or other useful structure–distinguished from structures not designed for occupancy (as fences or monuments) and from structures not intended for use in one place (such as boats or trailers) even though subject to occupancy b : a portion of a house occupied as a separate dwelling : APARTMENT, TENAMENT–used only in some legal statutes.

Dkt. 27, p. 14 (quoting *Webster*, 292 (Unabridged ed. 2002)).[6] Under this definition, defendant

argues, a building contemplates a structure with a roof and walls, as well as some form of

occupancy by people, animal, or property, and would exclude other common structures not

attached to a building, such as fences, decks, or docks.

      Plaintiffs argues that instead of focusing on the portion of the definition following "usu.",

the Court should limit its focus to the first part, i.e., "a thing built, a constructed edifice designed

to stand more or less permanently, covering a space of land."[7] This is because while the policy

does not define "building", it contains a definition of "fully enclosed building," which they assert

exactly corresponds to the more narrow definition of "building" following "usu". In other words,

plaintiffs argue that if the Court adopts the definition defendant suggests, then the same

---

[5] *See, e.g., Kitsap Cnty.*, 136 Wn.2d at 583; *Kish*, 125 Wn.2d at 171.

[6] As defendant further notes, this definition is in line with those commonly used by other contemporary dictionaries. *See* http://en.oxforddictionaries.com/definition/us/building ("[a] structure with a roof and walls, such as a house, school, store, or factory"); http://www.merriam-webster.com/dictionary/building ("a structure (such as a house, hospital, school, etc.") with a roof and walls that is used as a place for people to live, work, do activities, store things, etc"); http://www.collinsdictionary.com/dictionary/english/building ("something built with a roof and walls, such as a house or factory").

[7] Plaintiffs also suggest that the Court adopt the definition of "building" contained in *Black's Law Dictionary* (2nd ed. 1910): "A structure or edifice erected by the hand of man composed of natural materials, as stone or wood, and intended for use or convenience." Dkt. 24, p. 20. For the same reasons discussed below, though, the Court finds this definition also is not a reasonable interpretation of "building" as is used in the policy. Interestingly, the definition from the most recent version of *Black's Law Dictionary* (10th ed. 2014), matches those from the other contemporary dictionaries cited above: "A structure with walls and a roof, esp. a permanent structure."

ORDER - 11

definition would apply to two separate, but distinct terms in the same policy, an interpretation they argue is unreasonable. Dkt. 30, pp. 11-12 (citing *State Farm Mut. Auto. Ins. Co. v. Ruiz*, 134 Wn.2d 713, 720-21 (1998) (because the policy distinguished between two terms in the same policy section defining terms, to conclude that the insurer did not intend the terms to have different meanings "would nullify the differences between" those meanings, "and thus fail to give effect to each provision of the contract").

As defendants point out, though, the definition of "fully enclosed building" in the policy is not the same as that provided by the portion of the definition in *Webster* following "usu". The policy defines "fully-enclosed building" as:

> A building *with continuous walls on all sides*, extending from the ground level to the roof, with doors and windows (as deemed necessary) at various locations in the walls and including a continuous roof sheltering all areas within the wall perimeter.

Dkt. 29-3, p. 46 (emphasis added). *Webster* defines a building as one "covered by a roof and *more or less* completely enclosed by walls." *Id.* at 292 (emphasis added). Thus, whereas a "fully enclosed building" refers solely to a building that has continuous walls on all sides, the definition of "building" in *Webster* includes buildings that are completely enclosed, *as well as* those that are not. In other words, the *Webster* definition is broader than the one contained in the policy for "fully enclosed building," and thus is not inconsistent therewith.

The Court further agrees with defendant that adopting plaintiffs' definition would render other terms in the Hartford policy meaningless. If under the policy "building" is defined to mean "a thing built, a constructed edifice designed to stand more or less permanently, covering a space of land," then there would be no need to distinguish between "buildings" and "other structures"—or between "buildings" and "[s]tructures that are not buildings"—in the policy's coverage and loss settlement sections. The policy also makes a clear distinction between "the dwelling", which is

ORDER - 12

covered at replacement cost, and "other structures" that are "set apart from the dwelling," which are

only covered at ACV. Again, there would be no need for this distinction if a building simply

meant "a thing built."

Other provisions of the policy support defendant's interpretation. As defendant points out,

a number of those provisions contemplate a building that is enclosed by walls and a roof, and

that functions to protect or enclose persons or property. For example, under the section for

additional coverage, "collapse" is defined to mean "an abrupt falling down or caving in of a building

or any part of a building with the result that the building or part of the building *cannot be*

*occupied* for its current intended purpose." Dkt. 29-3, p. 53 (emphasis added). In terms of what is

covered, the subsection on collapse goes on to read:

> **b.** We insure for direct physical loss to covered property involving collapse
> of a building or any part of a building if the collapse was caused by one or
> more of the following:
> > **(1)** The Perils insured Against named under Coverage C;
> > **(2)** Decay that is hidden from view, unless the presence of such decay is
> > know [sic] to an "insured" prior to collapse;
> > **(3)** Insect or vermin damage that is hidden from view, unless the
> > presence of such damage is known to an "insured" prior to collapse;
> > **(4)** Weight of contents, equipment, animals or people
> > **(5)** Weight of rain which collects on a roof; or
> > **(6)** Use of defective material or methods in construction, remodeling or
> > renovation if the collapse occurs during the course of the
> > construction, remodeling or renovation.
> **c.** Loss to an awning, fence, patio, deck, pavement, swimming pool,
> underground pipe, flue, drain, cesspool, septic tank, foundation, retaining
> wall, bulkhead, pier, wharf or *dock is not included under **b.(2)** through **(6)***
> *above, unless the loss is a direct result of the collapse of a building or any*
> *part of a building.*

*Id.* (emphasis added). Plaintiffs argue that because this language only applies to additional

coverage for collapse, and because it does not apply to "other structures" under Coverage B or to

collapse coverage **b.(1)**, the policy should be construed to cover docks as buildings under all

coverages other than additional coverage for collapse.

ORDER - 13

1
2
3
4
5
6
7
8

The Court finds no merit to this argument. First, as discussed above, language elsewhere in the policy supports an interpretation that distinguishes between buildings and other structures. Second, the fact that section **b** does not apply to other structures under Coverage B, *supports* the overall policy distinction between buildings and other structures. Indeed, as noted, docks are *not* covered unless the loss is the direct result of the collapse of a *building*. Third, as defendant notes, loss for perils insured against under Coverage C apply to personal property, and therefore there is no need for **b.(1)** to apply to the other structures listed in **c**. *Id.* at pp. 56-58.

9
10
11
12
13
14
15
16
17

References to the term building in the section on coverage for personal property provides additional support for defendant's position. For example, loss due to windstorm or hail "does not include loss to the property *contained in a building* caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing *an opening in the roof or wall* and the rain, snow, sleet, sand or dust enters through this opening." *Id.* at p. 56 (emphasis added). Further, loss due to falling objects "does not include loss to property *contained in a building unless the roof or an outside wall of the building* is first damaged by a falling object." *Id.* at p. 57.

18
19
20

Courts from other states have adopted the definition of "building" contained in *Webster* as well. One such court tasked with interpreting that term contained in an insurance policy with substantially similar language to that at issue here observed:

21
22
23
24
25
26

The dictionary provides both a broad definition—"a thing built"—and a narrower definition—"a constructed edifice * * * usu. covered by a roof and more or less completely enclosed by walls, and serving as a dwelling * * * distinguished from structures not designed for occupancy (as fences or monuments)[.]" . . .

Plaintiff contends that, in the context of the policy, the broader definition is plausibly applicable and that the bridge is covered by the policy because it is "a thing built." We conclude that, considered in the context in which the term is used, the narrower definition is more plausible. Further, when the term is

ORDER - 14

viewed in the context of the policy as a whole, the narrower common meaning of "building" is the only plausible meaning.

First, as noted, the policy describes, as an exception to its "collapse" exclusion, the "direct physical loss to covered property involving the sudden entire collapse of a building or any part of a building." The policy lists certain structures ("awning, fence, patio, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead pier, wharf, or dock") for which no collapse coverage is provided, "unless the loss is the direct and immediate cause of the collapse of the building." Implicitly, the policy contemplates that the listed structures are not buildings, despite the fact that they are things "built." Thus, necessarily, the term "building" has a meaning narrower than simply a "thing built."

That conclusion is borne out by the many references to "building" throughout the policy. For example, the policy's "windstorm or hail" peril "does not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust" except "when the direct force of wind or hail damages the building *causing an opening in a roof or wall* and rain, snow, sleet, sand or dust enters through this opening." (Emphasis added.) The policy's "falling object" peril does not "include loss to property contained *in a building unless the roof or an exterior wall of the building is first damaged by a falling object*." (Emphasis added.) The peril of "weight of ice, snow or sleet applies to "damage to property *contained in a building*." (Emphasis added.) The policy covers "direct physical loss to a covered building or covered property *contained in a building* resulting from the eruption from a volcano." (Emphasis added.) It would seem from the various references to "building" that the policy contemplates the narrower common meaning of "building" and that a building is a structure that can contain things and that has walls and a roof; the disputed bridge had none of those characteristics.

*Ortiz v. State Farm, Fire and Cas. Co.*, 244 Or.App. 355, 361-62 (2011) (emphasis in the original); *see also People's Ins. Counsel Div. v. State Farm and Cas. Ins. Co.*, 214 Md.App. 438, 454-57 (2013) (detached carport with no walls is not a building); *Bergeron v. State Farm Fire and Cas. Co.*, 145 N.H. 391, 394-96 (2000) (building does not include a dam that impounded a pond); *Arkin v. Fireman's Fund Ins. Co.*, 228 Ga.App. 564, 566 (1997) (declining to include a culvert within the plain meaning of building). The Court joins those courts–and at least one other state court–in finding that the only reasonable interpretation of the term building under the Hartford policy is that it does not include a detached structure such as a dock. *See Bischel v. Fire*

ORDER - 15

1  *Ins. Exch.*, 1 Cal.App. 4th 1168, 1175 (1991).

2        Plaintiffs nevertheless argue that the relevant extrinsic evidence clearly demonstrates that

3  both parties understood and intended the policy to provide full replacement cost coverage for the

4  dock. First, as explained above, extrinsic evidence only comes into play if there is an ambiguity

5  in the policy language. As just discussed, the policy is not ambiguous as to whether the dock is a

6  building for purposes of coverage. Even if such an ambiguity can be said to exist, furthermore,

7  the extrinsic evidence in this case does not support plaintiffs' position.

8

9        Second, to the extent Mr. Herzog relied on the language of the brochure he received for

10  his belief that Hartford would cover the full replacement cost of his dock, that reliance was

11  misplaced. The brochure specifically refers to coverage for a dwelling. There is no promise that

12  other structures, such as a dock, would be covered at that level. The first written quotation Mr.

13  Herzog received merely indicated that 100% of rebuilding cost had been *requested*, and it broke

14  the limit of liability down between dwelling and home building cost on the one hand, and other

15  structures on the other. The same was true with respect to the follow-up written correspondence

16  up and until the time Mr. Herzog signed the policy. Accordingly, there is no written evidence

17  that Hartford had ever promised or agreed to provide coverage at full replacement cost for other

18  structures, including the dock.

19

20        Even if Mr. Herzog's statements that a Hartford agent had assured him that the policy

21  would cover the full replacement value of the dock are taken as true, again given that none of the

22  written documentation–including that which Mr. Herzog eventually signed–made any such

23  assurance, his reliance on those statements cannot be seen as reasonable. Further, "[a]t no time

24  since 2009," did Hartford offer "an insurance product that would have provided full replacement

25  cost to other structures that are not buildings," including plaintiffs' dock. Dkt. 34, p. 2. This is

26

ORDER - 16

important given that in Washington, "*[u]nilateral or subjective* purposes and intentions about the meanings of what is written do not constitute evidence of the parties' intentions." *Williams*, 129 Wn.2d at 570 (quoting *Lynott*, 123 Wash.2d at 684) (emphasis added). In other words while Mr. Herzog may have believed he was entitled to coverage at RCV, that belief was neither reasonable nor one shared by Hartford.

II.     Actual Cash Value

Because plaintiffs' dock is not a building, it is covered at actual cash value at the time of the loss, that is, the cost of repairing the damage to the dock, less reasonable deduction for wear and tear, deterioration and obsolescence. As noted above, Hartford determined the RCV of the dock to be $57,015. Then, based on the age of the dock, as well as its lifespan, condition at the time of loss, and some additional applicable factors, Hartford applied a 50 percent depreciation ($26,878.50) to the RCV, to arrive at an ACV of $30,136.50 for the dock. Plaintiffs argue there is a factual issue as to whether Hartford correctly determined ACV in this manner. But plaintiffs have not provided any evidence that either this determination or the basis for arriving at it was incorrect. Accordingly, as they have not established a genuine issue of material fact with regard thereto, therefore are not entitled to summary judgment here.

III.    The Insurance Fair Conduct Act

Plaintiff argues defendant committed multiple violations of the IFCA. Under the IFCA:

> (1) Any first party claimant to a policy of insurance *who is unreasonably denied* a claim for coverage or payment of benefits by an insurer may bring an action in the superior court of this state to recover the actual damages sustained, together with the costs of the action, including reasonable attorneys' fees and litigation costs, as set forth in subsection (3) of this section.

RCW 48.30.015 (emphasis added). As discussed above, however, plaintiffs were not denied a claim for coverage or payment of benefits, let alone unreasonably so. Plaintiffs, therefore, cannot

ORDER - 17

1    establish a violation of the statute on this basis. The IFCA also provides:

2            (2) The superior court may, after finding that an insurer has acted
3        unreasonably in denying a claim for coverage or payment of benefits or has
         violated a rule in subsection (5) of this section, increase the total award of
4        damages to an amount not to exceed three times the actual damages.

5            (3) The superior court shall, after a finding of unreasonable denial of a claim
6        for coverage or payment of benefits, or after a finding of a violation of a rule
         in subsection (5) of this section, award reasonable attorneys' fees and actual
7        and statutory litigation costs, including expert witness fees, to the first party
         claimant of an insurance contract who is the prevailing party in such an action.

8    *Id.*

9        Plaintiffs argue an insurer violates the IFCA *either* if it unreasonably denies a claim

10   under RCW 48.30.015(1), *or* it if violates any of the Washington Unfair Claims Settlement

11   Practices Regulations enumerated in RCW 48.30.015(5). But as plaintiffs themselves

12   acknowledge, courts are split on whether a violation of one of the enumerated regulations alone

13   is sufficient to result in a violation under the IFCA. *See* Dkt. 31, pp. 14-17 (noting courts in this

14   district uniformly have held that only an unreasonable denial of a claim constitutes a violation

15   and citing cases); Dkt. 36, pp. 8-9 (pointing to cases from the Eastern District of Washington

16   allowing causes of action for violations of the regulations, whether or not a claim also was

17   unreasonably denied). As plaintiffs further note, the issue of whether the violation of one of the

18   enumerated regulations provides an independent caused of action under the IFCA is currently

19   pending before the Washington State Supreme Court. *See Perez-Crisantos v. Sate Farm Fire &

20   Cas. Co.*, Supreme Court No. 92267-5 (oral argument 10/5/16). [8]

21       Plaintiffs argue that in light of the pendency of *Perez-Crisantos*, and therefore potential

22   resolution of this issue, the Court need not decide whether the regulations they assert defendant

23   violated should result in the imposition of remedies under the IFCA or what those remedies

24   ────────────────────
25   [8] https://www.courts.wa.gov/appellate_trial_courts/supreme/issues/2016Sept.pdf.

26   ORDER - 18

should be. That determination, they assert, should wait until the Washington State Supreme Court has issued its final decision. Plaintiffs do request, however, that the Court nevertheless determine if defendant has in fact violated those regulations. The Court though finds that it is in the interest of judicial economy and comity to wait until *Perez-Crisantos* has been decided before addressing any such potential violations in this case. Accordingly, plaintiffs' motion for partial summary judgment on this issue, as well as the other issues of discussed above is denied, and defendant's motion for partial summary judgment is granted.

## CONCLUSION

For the reasons discussed above, defendant's motion for partial summary judgment (Dkt. 27) hereby is GRANTED, and plaintiff's motion for partial summary judgment (Dkt. 24) hereby is DENIED.

DATED this 30th day of November, 2016.

Karen L. Strombom
United States Magistrate Judge

ORDER - 19